SCHOOL PAPER SUPPLIERS v. United States Good morning, Mr. Horgan. Good morning. Please proceed. Good morning, Your Honors. This is a dumping case, and the issue is how to allocate general and administrative expenses. I'm going to direct your attention to the government's response brief, which says the government found that 11% of the remaining G&A expenses were attributable to newsprint trading and 89% to line paper manufacturing. Now, line paper manufacturing is the subject merchandise. Newsprint trading is the rest of the company's business. So they have allocated 89% of the general expenses to subject merchandise. Now, that is what the government did, and that's precisely why it's wrong. Because everything else in the administrative record says that the vast majority of Kesher Rawls' business is newsprint trading. In fact, if you look at the record, about 90%… But it's trading. It's not manufacturing. It's trading. They're a broker. That's right. It's essentially… It's like a stockbroker. Well, no, it's like a merchandise trader. Yeah, but a lot of stockbrokers arrange financing, and they do all sorts of things that aid and assist the transaction. Right, but this is merchandise. This is merchandise being traded. This is newsprint. This is an actual commodity. It's traded. So let's assume a stockbroker executes a $500 million transaction. You're not going to take the value of that transaction and put it into a denominator anywhere, right? This isn't a stock transaction. This isn't a contract. This is merchandise being traded. It's just trading. This is a commodity. What difference does it make? They're just traders. They're middlemen. Well, they are… The general accepted accounting principle for trade, how to allocate expenses over a commodity trading business, is to use the value of the goods traded. Now, the Commerce Department abandoned that principle here, but that is the general accepted accounting principle for allocating expenses over the value of the goods traded, is to use the value of that merchandise. Now, I say it's fundamentally different than a stock transaction, where you're talking about shares in a company. This is actual merchandise being traded. So I think it's very different than that. And I would… Your position is that the value of the goods traded is taken into account even when the title does not pass to the party in question? That's correct. Well, we're not saying it has to. We're saying that in this case, if you look at everything that went on during these transactions, they did in fact exercise all the control, provide the financing, actually take responsibility for payment for the goods. So they did act very much like an owner. But the real issue here is… But his position with respect to the Indian government was that it was not the owner. That's correct. It was a tax. It was done for tax purposes. It's a little hard to play both sides of that issue. Right. Okay, but the question is, even if you're correct, that because of that, you should abandon the normal way of valuing these goods. What the Commerce Department did still produced a result, which is completely at odds with the record. 90% of this company's business was newsprint trading. How do you end up allocating 89% of the general expenses to a business that only accounted for 11%? Because you don't include anything valuing the value of the paper and the denominator. Well, that's how you get there. The arithmetic, the 89, 11… Yes, that's how you get there. Right. But that's not reasonable. Right. But I mean, there's nothing wrong with the 89, 11, unless you're forced to put some of the value of the paper in the denominator. There's definitely something wrong with the 89, 11, because the nature of their business, the contours of their business, their business activity was 90% the other way. So you can't take a business which is 90% trading, newsprint trading, and 11% this export business, this line paper business, and then take the general expenses and assign them, allocate them in just the opposite way. So you're allocating 90% of your expenses. Well, the answer is yes, you can do that when your client chooses to structure the business the way they've chosen to structure it. I mean, the Catch-22 is the one you walked into. Just because they didn't accept titles? We're not in the business of manufacturing newsprint and then selling newsprint. We're in the business of arranging between a party who would like to make it and a party who would like to buy it. And we're just a middle person. We're a trader in that marketplace. And the way you value, the way you allocate expenses in that kind of business is over the value of the goods. And who says that? That's a generally accepted accounting principle. We cited it in our brief. We cited authority for that in our brief. But the point is that whatever formula the Commerce Department used, it produced an unreasonable result. It goes right to the heart of substantial evidence testing. Would a reasonable mind accept this evidence when everything in the record says, including the Commerce Department itself, says the vast majority of their business is newsprint trading? What does it mean? Is there a definition to the vast majority of their business? I mean, in the percentages you start out with, what are those percentages based on? Is there a generally accepted accounting principle as to how you calculate your percentage of the business with respect to print versus trading? Well, it's based on the record evidence. If you look at, for instance, in the joint appendix, what's your best, easiest way to look at it? It's not just the dollar value if you do it in rupees, or the dollar value for the lined paper is small, what, 100,000 bucks? Are we allowed to talk about numbers? Yeah, it's 10 to 1 in favor of newsprint trade. In terms of what, sales numbers? Are you looking at sales profits? In terms of sales numbers, in terms of value, volume, number of employees, number of transactions. They had 60 customers for newsprint and only two. There were only two sales of lined paper during this investigation period. And the lined paper was produced by a subcontractor. So it's not as if Casual was actually manufacturing this merchandise. Casual hired a subcontractor to manufacture the merchandise for it. So, again, they're not supervising the manufacturing operation. They're supervising one subcontractor. So that's why it's unreasonable, because this isn't a case where they're running around watching 200 workers on the floor. They hired a subcontractor. So the general expense for Casual was to supervise that one subcontractor. It wasn't part of your adversary's argument, Commer's argument, was, well, we can't slug a number in there in the denominator of the value of the goods that were transferred in the brokering operation, because we can't be sure that if we do that, we're not going to alter the overhead numbers. Aren't they talking about that? They couldn't be certain that there wouldn't be an increase in overhead associated with the newsprint business? With the ownership. They did say, well, we don't know what would happen if they actually took title. We don't know whether there might be some additional expense. Well, that's a what-if analysis. That's not record evidence. That doesn't support the idea that there were more expenses that we don't know about. They're just saying, well, maybe under a different scenario. Well, that's delusion. They're saying, I mean, there is perhaps some reason why they're saying, saying if we slug a number into a fraction the way you want us to, we've got to be sure that we can do that without altering the pristine perfection of the other pieces of the fraction that we've already established. Well, whatever number they slug in, the issue is whether that number, that formula, produces a reasonable result. Somebody in the corporate office who keeps track of taxes that go to the Indian government as part of your general overhead expenses in the front office, you know, taxes for the whole corporation, the whole business, you're going to have to hire somebody in there who's going to calculate the 16% and shoot the money off, aren't they? I mean, if you were actually taking title. You're not going to have to hire a second person. How do we know? I mean, certainly it's the – Well, that's exactly the point. How do you know? How can you base your determination on what you don't know? How can you say, well, we think maybe it would be different. If we had different facts – I thought what Congress was trying to do was to put that burden on your Before we can give you what you want in the denominator with the sales number, you've got to be able to show us that we don't have to alter the numerator number, and if so, how? Well, I can tell you don't have to alter the numerator because whatever the numerator is, however they add up the numerator, those are the expenses that need to be allocated. All right? We don't have any dispute with that. However they want to calculate that level. Right, but what happens if – If the numerator doubled in the raw number once you took title? Then the ratio might be higher. Well, how would we – what numbers do we know to put in? We've got to calculate a ratio, so we put in – You should use the number from our books and records. That's the way that Congress does business. They verify the books and records. You should use the number from the books and records. That's their – Well, you're asking for a hypothetical that hasn't happened. You're asking to have Congress treat your business differently than it actually is. I'm going to say don't tell the Indian government, but we want Congress to treat it as though we were actually buying the newsprint, bringing it in, and reselling it. We want Congress to treat it as it really is, as a trading operation, as they recognized it was when they dealt with the finance expense. They said this is essentially a trading operation. And when they calculated the finance expense – Right, and they said on the financing, we can be sure that the formulas, that the fractions don't change. We'll be – we're trying to help you out, Congress said. So once we get to the financing chart, we'll look at that, and yes, indeed, we can give you the benefit of the sales number because we're confident that all the rest of the calculations remain pristine. Right? And you accept that. On financing, yes. So aren't you, in essence, saying that Congress is really only allowed to give you the benefit of the doubt on the sales where they can be sure that the formulas aren't otherwise affected? No. What we're saying is that whatever formula Congress uses, it has to produce a reasonable result. It has to produce a result which is consistent with the overall business activity. What Commerce, I think, is saying is, yes, we have a duty to produce the most reasonable result we can produce given the circumstances. I mean, anytime you've got this make-believe formula you're putting together, right, because there's no actual transactions they can relate to. They have a constructed value here. Right. There's a little bit of a hello, a who's smoking what, in all those calculations that we see over here. Well, that may be true, and that's why you have to look at what the fundamental nature of the transaction is. Commerce agreed that the fundamental nature of this transaction was as a trading operation, the way you value, the way you allocate merchandise or expenses in a trading operation is over the value of the goods traded. All right. That's the generally accepted form. Would you like to reserve the balance of your time, Mr. Horgan? Yes. All right. Thank you. Ms. McCarthy? Good morning. Welcome back. Good morning. May it please the Court. Thank you. This is a substantial evidence standard here, and I think I'd like to just directly address Mr. Horgan's comments. And a lot of the numbers here, this is a case about numbers, and a lot of the numbers are bracketed. But if the Court could indulge me, and if I could just draw the Court's attention to Joint Appendix page 35, which is a portion of Commerce's remand determination. And just to address the 11%, 89% percentages thrown around by Mr. Horgan, placed in context, because... What page are you on? I'm sorry, page 35 of the Joint Appendix. Commerce performed a two-step analysis to recognize... We're on page 35. At the very bottom. There is a... The sentence begins, this amount is in fact only, and then there's a bracketed numbers and percentages, and it represents only, and then there's a much smaller percentage of the total G&A that was reported by Kedrewal on its income statement. And as Judge Eaton correctly noted below, Commerce took the record that came with it, and Kedrewal prepared an audited income statement, then Commerce performed a standard methodology, adjusted to account for the unique business model here. And this is... So at the end of the day, the percentage is not as disproportionately skewed towards line paper manufacturing as Mr. Horgan suggests. Mr. Horgan told us not once, not twice, but three times, that generally accepted accounting practices provide for, in the trading operation where you're trading goods as opposed to services, you plug into the denominator the value of the goods. Well, I think what Mr. Horgan was referring to... Is he right about that? No. I think what he's referring... Explain to us, slow down, and just explain to us why that is incorrect. Let me put this question to you. If he's correct, if Mr. Horgan is correct, that generally accepted accounting principles would call for plugging the value of the newsprint into the denominator. If he's correct, would you lose? Well, I think that would beg the question because really the... Can't beg the question. Because the statute directs Commerce to use general and administrative expenses. The statute doesn't define general administrative expenses. It doesn't dictate a methodology. It doesn't order Commerce to follow Commerce's procedures and methodologies we believe are in accordance with GAAP. I wouldn't say we would necessarily... Doesn't Commerce ordinarily follow GAAP? Yes, yes. And we believe it's following GAAP in this case. So if GAAP said X in this case and you did Y, wouldn't you be acting arbitrarily and capriciously? Well, we'd have to maybe have some explaining to do. All right. So why don't you explain to us why Mr. Horgan is just dead wrong when he tells us that GAAP tells you to plug the value of the newsprint into the denominator here? I think the only reference he's making to GAAP supposedly, I believe in the page 10 of his reply brief, which Mr. Horgan can correct us if I'm wrong. But that's referring to the cost incurred, but it hasn't incurred the cost. It hasn't incurred any cost for newsprint because it doesn't purchase the newsprint. So what Commerce did was... Just wrote it down. Page 10 of his reply brief? I believe so. Mr. Horgan didn't say what he was relying on. We don't really see... I don't share reference to GAAP. I don't either. I'm giving Mr. Horgan the benefit of the doubt. I assume that's what he's referring to when he says he's relying on GAAP. And this is referring to, you know, this is a generic principle that cost is a resource sacrificed or forgone to achieve a specific objective. And he wants to have plugged into the denominator the value of the newsprint traded, which is not a cost that Kedrewal ever incurred because it never purchased the newsprint. And so what Commerce did was take expenses on the income statement, an audited income statement that Kedrewal put on the record, and it took the costs that Kedrewal incurred in connection with its newspaper trading business and put those in the denominator. So those were the costs incurred in achieving the revenue for the newspaper trading business, which is an eminently reasonable methodology. And specifically to address... And the passage of title is not a formalistic requirement. This Court's already addressed the taking of title. It did so in Rumsfeld v. United Technologies. And again, the corporations can structure their commercial transactions however they wish, but they have to accept the consequences of that. And to the extent that Mr. Horgan is accusing both Judge Eaton and the Department of Commerce of speculation or being delusional, in the verification report, which is at Adrenopanics 90, if I could also indulge, I believe that there aren't any confidential numbers here, but on page JA90 of the verification report, Commerce specifically addressed the effect of the cost of the newsprint. And this is how Kedrewal decided to present this information in its audited financial statements. And Commerce wrote that if they did so, the cost of the newsprint to the end customers will increase by 16%, meaning if they did so, if they took title, the cost of the newsprint to the end customers will increase by 16% because traders or resellers are not end customers. Therefore, Kedrewal does not take possession of the newsprint and the actual cost and associated sales revenue of the newsprint, which is traded, is not reflected in its income statement. So Commerce, consistent with its methodology, it took the expenses, the indirect expenses, that were reflected on its income statement. Ms. McCarthy, if you're going to give the appellant here a break on the financial charges calculations, which you did, right? Yes. So you said even though these characters are not in any way, shape, or form responsible for the value of the goods traded in the newsprint side, it's fiction, you're saying, when it comes to the basic issue here, which is on the finance charge, we'll give them the benefit of the doubt, right? Yes. So if you do that, why aren't you required to give them the benefit of the doubt across the board? How can you treat as real the brokering transaction for the finance charges, right, but treat them as unreal for the other calculations? Because general administrative expenses are fundamentally different than financial expenses. So what? Because there's really no logical nexus between the cost of a traded good that you do not own and how that has to do with your office supplies, your warehouse expenditures, because you don't even own it, so they're not warehousing the newsprint. Whereas the financial expense ratio, and Congress explained it in its final determination at Joint Appendix 140, there's a direct nexus in the record between the financing of the newsprinted trading and the value of that trading in terms of loans and financing that just has nothing to do with G&A. G&A is a fundamentally different expense. It's an indirect expenditure that applies across the board to the company. For instance, the overhead expenses associated with the president and the vice president of this operation, they're neither attributable to newsprint or to line paper. Those are G&A expenses, and that's what Commerce went through. And also, Your Honor, I'd like to say in terms of giving them a break, Commerce gave Kedrewal a break twice. It gave them a break in the final determination. Well, you went through their so-called G&A expenses and made every effort to weed everything out that you could weed out of G&A and tuck into newsprint. And to treat it as a direct expense and put it in the denominator. That was enormously to Kedrewal's benefit. Commerce had applied its standard methodology, and Commerce, of course, is accustomed to dealing with manufacturers because there aren't any dumping orders on people who provide services. Isn't your argument at bottom, Ms. McCarthy, really, that in circumstances like the ones that are presented in this case, Commerce's job is to do the best it can, not to do a perfect job? Absolutely. It does the best it can, and as Judge Eaton said quite correctly below, it takes the record as it came to it. And it could have applied. I could defend it. It could have applied its standard methodology, and there's a lot of deference here that Commerce is entitled to, but it didn't. It went the extra mile and twice went through verification, and Kedrewal verification identified these expenditures that were directly related to the newsprint trading operation, and Commerce adjusted it to provide the fairest, most reasonable allocation. I noted that in the reply brief, Eurodif is cited here by your adversary as though it supports them. I suppose you argue that Eurodif actually supports you. Yes, certainly in terms of Dutch leaveners. This is because once Commerce has the discretion and decides what it does in the context of a setting, it in essence becomes something to which we all have to defer.  I mean, this is really probably on a continuum. But Eurodif, on the other hand, does have a neat line in it that your adversary has picked up, which in essence has said, you know, you've got to be realistic, right? You look through formalities to find out the reality of what's happening in the marketplace when you're engaging in these calculations. Right, and well, we believe that Commerce is realistic because of the really contextual... I mean, wasn't Eurodif actually in a similar type of situation? They're trying to decide whether you had a sale or whether you had a brokering type of a transaction? Yes. They were trying to decide whether the uranium services were services, whether they were sale of goods or whether they were sale of services, right? And in that case, Commerce is... Well, the Supreme Court held that Commerce was entitled to deference in which way it came out, which was different, which is arguably different than how it came out under the CDA. So in this case, this is on a continuum. I think Commerce is entitled to really an extraordinary amount of deference because it's not dictated by the statute. There's no question that it's following its standard methods and methodology and it's making adjustments to reflect the record that was presented to it. And also, it did it to Kedgerwell's benefit, but nonetheless, it's appealing here. So we respectfully request the court affirm. All right, thank you very much, Ms. McCarthy. Mr. Breitbill? Good morning. Good morning. Thank you, Your Honors. May it please the court. In three minutes, I would like to make three points, but first I thought I would address, Judge Clevenger, your question about why make the adjustment for the finance ratio in the denominator but not the GNA ratio. I think the lower court did a very good job of this on page 6 of its opinion. The main reason is that Kedgerwell does finance newsprint and it does incur costs for financing newsprint, but it does not buy or sell newsprint and it doesn't incur costs for buying or selling newsprint. So that's the distinction and the reason why Commerce, in its discretion, supported by substantial evidence, made the adjustment. Well, they incur costs for the brokering operation. They incur minor costs, which are reflected in the calculation. But wait a second. They got most of their employees around the telephone all the time saying, hey, do you need some newsprint, and then saying, hey, could you make some? Talking to the insurance people, talking to the transportation people. Yes, but Your Honor. With the hubbub, if you went into their main office, the noise, the hubbub, all has to do with the newsprint. It doesn't have to do with the lined paper stuff. Yes, but Your Honor, that ignores what Commerce did, which was to look very carefully at those operations that were solely dedicated to newsprint and to take them all out of the numerator and move them to the denominator. So it properly did that. In fact, that's... Right, but you don't challenge your adversary's arithmetic when they say the bottom, bottom line here, we're going to tell the whole world that 89% of the G&A in this operation goes to lined paper, right? Well, I... You don't disagree with those numbers, do you? I think it is an inaccurate statement to make. Can you answer that yes or no? I mean, is the arithmetic correct? The 89-11, is that correct? It's correct, but it doesn't take into account the adjustment that Commerce made first. The phrase that Mr. Horgan read was... Commerce found that 11% of the remaining G&A expenses were attributable to newsprint trading and 89% to lined paper. Remaining ignores the fact that it made that huge adjustment up front, moving numbers out of the numerator... It was correct. I mean, the short of the matter is that anybody that's got in their G&A account a bunch of stuff that isn't G&A doesn't belong in the account, so you clean it up. That's correct. In fact, Mr. Horgan also said that you should have used the number from our own books and records. Well, we would have been very grateful... Let's assume this was a corporation. What do you suppose the stockholders would think if the chairman of the board got up at the annual meeting and said, I just want to tell you what our G&A expenses are because you all ought to know about that. Yes. 89% of them are absorbed by our lined paper business and 11% is absorbed by our newsprint business. The stockholders would hoot. I mean, they'd start laughing. Can't be. I mean, you look at... If 99... If 90% of your business is over here and 10% of your business is over here and you assign 90% of the G&A to 10% of the business, isn't everybody going to say who's smoking what around here? I mean... Well, again, Your Honor, I don't think... When you take into account all the adjustments that Commerce made... No, I understand that, but I... I just want you to come to grips with your adversary's main argument, which is this doesn't make any sense. It does not make any sense to say that 90%, if you will, of the G&A is attributable to 10% of the business. Well, all Commerce did was look at the costs, and where the costs were, that's how it made the 89%, 11% allocation. It looked at that very carefully. I think Joint Appendix 60 shows that breakdown very well. I agree that the 89... That's what I harassed your adversary with, to say the numbers are right. The problem is how did you get to the number? That's right. If you end up with an end result which is just irrational, then I think your adversary's core argument is the methodology has to be flawed. Yes, I would argue...  It's not irrational. Commerce properly determined not to include a value for brokered newsprint in the denominator, and it didn't speculate, it just allocated... What's your answer to Mr. Horgan's argument that GAAP says you're supposed to do that? I could not identify which GAAP principle Mr. Horgan was referring to in his brief. I don't think there's one that speaks to that precise question. I would just note that Kedgewall, in its own books and records, included... If you look again at its profit and loss account, and this is Joint Appendix 308, it doesn't include a value for turnover, except as a note. I can't get much more into the proprietary details, but it prepared its own profit and loss account in accordance with GAAP, I presume, and the newsprint is not included there. Any final comment? Final comment just regarding Eurodiff. We welcome that comparison to Eurodiff, because the real lesson of that Supreme Court decision is that commerce determines whether a transaction is a sale of goods or a sale of services, and applying that reasoning, Kedgewall didn't buy or sell or take legal ownership of newsprint. It was an intermediary providing financial services. Commerce had already cut Kedgewall a huge break in this investigation by changing Kedgewall's own books and records on G&A. Any further rewriting would have been inconsistent with the economic reality in this case, and that's why the lower court case should be upheld. Thank you very much. Mr. Horgan, you have three minutes for rebuttal. Thank you. First of all, I do want to agree with Judge Clevenger. You did get the core of our argument right. Whatever formula they use, it's got to produce a rational result, a reasonable result that's consistent with the record. That is the core of our argument. Whatever formula they used didn't work in this case, and the reason is because they assigned 89% of the general expenses to 10% of the business. That's unreasonable. That's irrational. As you said, any board of directors would say, what's going on here if you did that? And that is the core of our argument. Your gap argument kind of went down the drain, didn't it? No. If you look at page 18 of our opening brief, that begins a section with the generally accepted accounting principles, and what we cited was the Commerce Department's own practice, all right, of how they allocate the Merck expenses. Page 18? 18, if you begin at the bottom of that paragraph. And also, we cited the Fundus-Fuyao-Glask Industry Corp of the United States, a CIT decision, and if you read the parenthetical there, it says... I thought the difference with the PASTA guys was that they actually took on the PASTA. Excuse me? You're relying on these other cases? Yes. Our point on that, on generally accepted accounting principles, was if we had taken title, there's no doubt that this is what would have happened. Oh, no, well, come on. If you take entitlement gains, oh... Right, but... That's your gap argument, is that you took title? No. But it is that Commerce recognized in the financial, in its analysis of the finance expense, that what they were doing was essentially a merchandise trading operation. So if that's true, if that's the reality, and that's your Supreme Court decision, if that's the reality, this is really a merchandise trading operation, then this is... Right, a merchandise trading operation where you take title and then you hold it and then you sell it. And Commerce said this is essentially that. And if you look at the... You know, the fact... We did not take title only for tax purposes. But Commerce said this is essentially a merchandise trading operation. And that 16% probably more than takes care of the duty, right? The dumping duty. Well, some years yes, some years no. I mean, well, come on. You know, rob from Peter to pay Paul. Right. But that is our basic principle, is that you've produced an irrational result. And the example we used in our brief was the President's salary. I mean, if... The President's salary is clearly a general expense. And if he's devoting 89% of his efforts to 10% of his business, that's irrational. And that's what we've got here. We've got an irrational result. So whatever formula they used to get there doesn't really matter. It produced an irrational result which is not... Well, you wouldn't ask them to break the law. No, they have much discretion here. So they wouldn't be breaking the law. They didn't break the law when they calculated financial expense. The court below approved that. We're asking them to use the same kind of approach in this case. Any final thoughts, Mr. Horgan? Pardon me? Any final thoughts? No, Your Honor. We believe, as I said, they've got to come up with a formula that's rational and supported by the record. Thank you very much. Thank all counsel.